UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NANCY ROSCHIVAL,

     Plaintiff,

v.

MELANY GAVULIC and HURLEY
MEDICAL CENTER,

     Defendants.

Case No. 15-10182
Honorable Laurie J. Michelson
Magistrate Judge Elizabeth A. Stafford

---

**OPINION AND ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [22]**

---

Defendant Hurley Medical Center, through its CEO, Defendant Melany Gavulic, terminated Plaintiff Nancy Roschival's employment in July 2014. Defendants say that that they no longer needed Roschival's position because, during a reorganization, they closed the office Roschival worked for and transferred much of her responsibilities to a third-party administrator.

Roschival does not dispute this. But she says that Defendants failed to follow their layoff procedure and that a less senior employee should have been laid off instead of her. That less senior employee is black, and Roschival is white. Roschival alleges that Gavulic targeted her to favor her black colleague, violating the Constitution's Equal Protection Clause in the process. She thus filed this action under 42 U.S.C. § 1983, Michigan's Elliot-Larsen Civil Rights Act, and the Michigan law of wrongful termination.

Before the Court is Defendants' motion for summary judgment (Dkt. 22, Defs.' Mot. Summ. J.), for which the Court heard oral argument on May 10, 2016. For the reasons discussed, the Court will dismiss the case. On this record, Roschival has not shown that Gavulic's articulated reason for termination was a pretext for racial discrimination in violation of the Equal

Protection Clause, and the Court declines to exercise supplemental jurisdiction over Roschival's remaining state-law claims.

## I.

### A.

Plaintiff Nancy Roschival started working in human resources for Defendant Hurley Medical Center in 1995. (Pl.'s Resp. Ex. 4, Roschival Dep. at 8.) She is white. (*Id*. at 20.) So is the person who would ultimately terminate her, Defendant Melany Gavulic, who became Hurley's CEO during the last two years of Roschival's employment (i.e., in 2012). (Pl.'s Resp. Ex. 5, Gavulic Dep. at 4.)

Roschival spent most of her time at Hurley in its Employee Health Office ("EHO") (Pl.'s Resp. at 5), which, among other things, provided occupational health services (Defs.' Mot. Ex. 5, Gavulic Aff. ¶ 4). Roschival's job title was "Human Resource Service Center Advisor," and her primary role was to process worker's compensation claims. (Roschival Dep. at 10, 13–14.)

During a reorganization from 2013–14, Hurley trimmed and then closed its Employee Health Office. In mid to late 2013, some employees were laid off. (*See* Defs.' Mot. Ex. 8, Letters; Roschival Dep. at 10.) In September 2013, Roschival met with Colleen Mansour, who was then the Interim Senior Administrator of Human Resources. According to Roschival's notes, it seemed to Roschival that she was about to lose her job, as Mansour confirmed that all but one Employee Health Office employee would be laid off. (Pl.'s Resp. Ex. 14, Sep. 15, 2013 Notes.) But Roschival kept her job, at least at first. The next week, Mansour informed Roschival that due to the reorganization of the Employee Health Office her position would be eliminated the next month, but Roschival would be moved to the Human Resources Department. (Pl.'s Resp. Ex. 15,

Sep. 23, 2013 Letter.) In November 2013, Roschival's job title changed to "Human Resources Coordinator I," but her duties remained the same. (Roschival Dep. at 13.)

Hurley completely closed its Employee Health Office on August 4, 2014,[1] resulting in Roschival's termination. (*See*, *e.g.*, Defs.' Mot. Ex. 7, Aug. 1, 2014 Letter; Gavulic Aff. ¶ 4.) The EHO's occupational health services were transferred to a new entity, Hurley Health Services. (Gavulic Aff. ¶ 4; Aug. 1, 2014 Letter.) Additionally, a third-party administrator absorbed a larger share of the processing of worker's compensation claims, which had been Roschival's role. (Gavulic Aff. ¶ 6.) On July 31, 2014, Gavulic informed Roschival that she would be terminated effective August 14, 2014. (Pl.'s Resp. Ex. 16, Jul. 31, 2014 Letter.) A layoff notice stated that the reason for the termination was that "Employee Health Office is being closed and these services will reside in an Occupational Medicine Clinic provided to Hurley Medical Center through Hurley Health Services." (Pl.'s Resp. Ex. 17, Layoff Notice.) Roschival acknowledges that the decision to close the office—made by Gavulic—had nothing to do with race. (Roschival Dep. at 14.)

## B.

Roschival's claims in the case center on whether Hurley followed its own layoff procedures when it terminated her. Roschival was what Hurley refers to as an "exempt" or "non-bargaining unit" employee. (Gavulic Dep. at 20–21.) As such, Hurley's Exempt Employee Handbook set the terms of Roschival's employment relationship with Hurley—including the layoff procedures it had to follow. (Pl.'s Resp. Ex. 6, Handbook; Gavulic Dep. at 21.)

---

[1] Roschival contends that the office was closed in 2013, not 2014. (*See* Pl.'s Resp. at 2, ¶¶ 5–7.) She offers no evidence to support this assertion and mistakenly refers to this as a fact that is not in dispute: "The following facts are not in dispute: . . . In 2013—after the EHO was closed . . . ." (Pl.'s Resp. Br. at 5.)

3

In their most basic sense, the handbook's layoff procedures essentially allow for certain employees with more tenure to "bump" their junior colleagues, so the junior employee is let go first. For example, when Hurley first culled the Employee Health Office in the summer of 2013, Roschival "bumped" Gerry Smith, who shared her title of Human Resources Service Center Advisor at the time.[2] (Roschival Dep. at 10.) He was let go, while she was simply reassigned. (Roschival Dep. at 10–11.)

As the governing handbook provides, "Layoffs or status reductions within classifications and department are made in reverse order of seniority within classification and department." (Handbook, at 7.)[3] However, "Employees who are laid off may not bump other employees in other classifications and/or departments." (*Id.* at 8.) The handbook defines "seniority" as "the length of service within classification (hospital-wide) without a break in service." (*Id.* at 6.) But the handbook does not define "classification," and there is some disagreement as to what it means.

## C.

The individuals directly involved in Roschival's termination interpreted "classification" to be the equivalent of job title. As will be described in more detail, they thus concluded that because Roschival was the only employee with her job title ("Human Resources Coordinator I") at the time of her termination, she was not eligible to "bump" a less senior employee.

---

[2] The Court understands that the process may have been different in this scenario because Smith was a union employee (*see* Roschival Dep. at 10; Sep. 15, 2013 Notes), so the Court cites this only for background purposes.

[3] The handbook provides another bumping mechanism that is not as central to this case: "Layoffs or status reductions within classification, promotional units and departments are made in the following order: [1] Temporary or emergency employees [2] Provisional employees [3] Per-diem employees [4] Seasonal employees [5] Probationary employees [6] Part-time employees [7] Full-time employees." (*Id.*)

Around a month before Roschival's termination, Gavulic enlisted Debra Roriex, a Human Resources Recruiter, to determine how to handle Roschival's position in light of the Employee Health Office's pending closure. (Gavulic Dep. at 8–10; Pl.'s Resp. Ex. 7 Roriex Dep. at 6, 25.) As Gavulic testified, "I was not clear on how any of that would be transacted. All I knew is there would no longer be work in the Employee Health Office for what Nancy was doing and there would be an impact so I was seeking HR's role in how that would be handled." (Gavulic Dep. at 9.)

Roriex says that she looked to the handbook for the appropriate procedure to follow. (Roriex Dep. at 27.) To recap, the handbook says that "Layoffs or status reductions within classifications and department are made in reverse order of seniority within classification and department." (Handbook, at 7.) Roriex says she determined that the relevant department was human resources and that Roschival was the sole person in her classification. (Roriex Dep. at 27–28.) This made Roschival ineligible to bump anyone, Roriex concluded. (*Id.* at 27–28.)

While Roschival's title was Human Resources Coordinator I, a less senior employee in the human resources department, Jamal Dozier, who is black, held a similar title: "Human Resources Coordinator." (Pl.'s Resp. Ex. 1, Jackson Aff. ¶¶ 16–17.)

Despite the similarity between Roschival's and Dozier's titles, Roriex testified that she determined that Roschival was alone in her classification because "[t]here was no one else in Human Resources with her same title." (Roriex Dep. at 28.) Gavulic deferred to Roriex's conclusion. (Gavulic Dep. at 10.) In her testimony, Gavulic explained her concurrence, stating that Human Resources Coordinator and Human Resources Coordinator I were not in the same

classification because "[t]hey are two different jobs and the responsibilities and duties outline that." (Gavulic Dep. at 53.)[4]

Still, because of the similarity between Roschival's and Dozier's titles, Roriex and Gavulic did consider whether Roschival should "bump" Dozier. (Roriex Dep. at 48.) Gavulic specifically asked Roriex whether Dozier should be laid off instead of Roschival. (*Id.* at 45.) According to Roriex, Gavulic "wanted to know how to handle the layoff for Nancy" and "how to handle Nancy because of her classification. She was the only one in that classification, and not Jamal." (Roriex Dep. at 45.) Roriex also testified, "I believe [Gavulic] just wanted to know that it wasn't Jamal because of their titles. The titles were different. So I told her, no, it wasn't Jamal." (Roriex Dep. at 48.)

Pursuant to Roriex's application of the layoff procedure, Dozier was not laid off. Like Dozier, Roriex is black.  (*See* Roriex Dep. at 41.)

### D.

Two former Hurley human resources employees offer a competing theory on what the layoff procedure is and how it should have applied to Roschival: they suggest that the layoff procedure instead depends on a job "series" and that Dozier should have been laid off instead of Roschival.

A job "series" would be, for example, Social Worker I, II, and III or Maintenance Mechanic I, II, and III. (Roriex Dep. at 16; Pl.'s Resp. Ex. 10, Foster Dep. at 12; Pl.'s Resp. Ex. 9, Jackson Dep. at 41–42.)

---

[4]  Gavulic also testified that she was unaware whether the handbook defined classification. (Gavulic Dep. at 41.) She thought Mansour would know how it was defined. (*Id.*) Mansour, however, testified—apparently mistakenly—that the term "classification" would not apply to non-bargaining unit employees. (Pl.'s Resp. Ex. 11, Mansour Dep. at 12–14.)

Rebecca Jackson, who served as Assistant Human Resources Director of Operations for Hurley from 2001 until October 2010 (and was someone whom Roriex used to use as a resource for layoff decisions (Roriex Dep. at 10–11)), and Lisa Foster, who served as Assistant Director of Human Resources for Employment Compensation in Hurley Medical Center's Human Resource Department from 1995 until July 2010, each stated in their individual affidavits that the layoff procedure at Hurley hinged on job series:

> If there were a job series within a particular promotional unit for a particular classification, then the lowest number within the job series with the least senior employees would be laid off first.
>
> In other words, if a promotional unit had employees who, for example, were Social Worker I, Social Worker II, Social Worker III, in a reduction of force or layoff, the least senior member of Social Worker I would be laid off first, then the least senior employee of Social Worker II classification would be laid off next, and then finally, it would reach Social Worker III.

(Pl.'s Resp. Ex. 1, Jackson Aff. ¶¶ 8–10; Ex. 2, Foster Aff. ¶¶ 8–10.)

Jackson and Foster each also stated in their affidavits that "layoffs and recalls for exempt employees were governed by the Exempt Employee Handbook, specifically Section 9 – Layoffs or Recall – on pages 7 and 8 of the Exempt Employee Handbook." (Jackson Aff. ¶ 7; Foster Aff. ¶ 7.)

Jackson and Foster each opined that Hurley "did not follow polices found in the Hurley Medical Center Exempt Employee Handbook on pages 7 and 8" when it terminated Roschival. (Jackson Aff. ¶ 15; Foster Aff. ¶ 15.) They each reasoned that "[a]ccording to the Hurley Medical Center Exempt Employee Handbook, as well as past practice," Dozier should have been laid off because "he was in the lower Human Resource Coordinator position within the job series and he had the least amount of seniority." (Jackson Aff. ¶ 17; Foster Aff. ¶ 17.)

In her affidavit, Jackson offered this opinion for why Roschival was terminated instead of Dozier:

> The one explanation . . . is because there was a past practice within the Human Resource Department, and also within the hospital as a whole, that when reorganization/layoffs did occur, special preference was given to African-American employees in their retention. In other words, Hurley Medical Center made great strides to retain African-American employees during reorganizations and layoffs. Caucasian employees were not given the same consideration as African-American employees with respect to reorganizations/layoffs within the hospital.

(Jackson Aff. ¶ 20.) Jackson also testified that at unspecified times in the past, after proposing someone for a layoff, "The union would sometimes say, 'That person is African American. We don't want that person laid off.'" (Jackson Dep. at 71–73.)

**E.**

Roschival filed her complaint in this Court on January 16, 2015 and an amended complaint a week later. (Dkt. 1, Compl.; Dkt. 4, Am. Compl.) Her amended complaint includes four counts. Count I asserts a 42 U.S.C. § 1983 racial discrimination claim against Gavulic. (Am. Compl. ¶¶ 23–27.) Counts II and III assert wrongful discharge claims under Michigan law against Hurley on the basis that Hurley lacked good cause to terminate Roschival and breached representations concerning job security and layoffs. (*Id.* ¶¶ 28–36.) Count IV asserts a racial discrimination claim against both defendants under Michigan's Elliott-Larsen Civil Rights Act. (*Id.* ¶¶ 37–39.)

Defendants filed their motion for summary judgment on October 30, 2015. (Dkt. 22, Defs.' Mot. Summ. J.) They did not file a reply to Roschival's response (Dkt. 23, Pl.'s Resp.).

**II.**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

On summary judgment, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party, here Roschival. *See Matsushita*, 475 U.S. at 587.

### III.

The Court begins with Roschival's Section 1983 claim that Gavulic violated her rights under the Constitution's Equal Protection Clause by terminating her on the basis of her race.[5] Roschival asserts her sole federal count specifically against Gavulic, not Hurley. (Am. Compl. ¶¶ 23–27.)

As in the Title VII context, a plaintiff can prove a Section 1983 discrimination claim with direct or circumstantial evidence. *See Weberg v. Franks*, 229 F.3d 514, 522–23 (6th Cir. 2000). As Roschival relies on circumstantial evidence, the Court will apply the burden-shifting

---

[5] The parties do not dispute that Hurley is a public hospital (*see* Am. Compl. ¶ 3) and that a Section 1983 claim is therefore appropriate.

framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) ("In weighing an employment discrimination claim asserting disparate treatment under § 1983, this Court applies the familiar *McDonnell Douglas* framework applicable in similar cases brought under Title VII.").

Accordingly, Roschival has an initial burden to establish a prima facie case of racial discrimination. *McDonnell Douglas*, 411 U.S at 802. The burden then shifts to Gavulic to articulate a legitimate, nondiscriminatory reason for terminating her. *See id.* If Gavulic meets her burden, then Roschival "must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016).

In a typical racial discrimination case, a plaintiff establishes a prima facie case by showing she was "(1) a member of a protected class; (2) discharged; (3) qualified for the position; and (4) that a similarly situated non-protected person was treated better." *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 661 (6th Cir. 2013) (internal quotation marks and citations omitted).

But this is not a typical case, and Roschival's initial burden is greater. Because Roschival's claim is one of reverse discrimination, she "must demonstrate 'background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority,'" as part of the first element of her prima facie case. *See Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002) (quoting *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985)).[6] Roschival's burden under the fourth element is different as well: when "a discrimination claim is based on termination arising

_____

[6] Neither party's briefing acknowledges that the "background circumstances" element applies in this case.

10

out of a work force reduction, [the Sixth Circuit] has modified the fourth element to require the plaintiff to provide additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Rachells*, 732 F.3d at 661 (internal quotation marks and citation omitted).

## A.

On this record, the Court is doubtful that Roschival has set forth enough evidence to establish a prima facie case of discrimination. For one, Gavulic is the sole defendant for Roschival's Section 1983 claim. Yet Roschival has identified no "background circumstances [to] support the suspicion that the defendant[, Gavulic,] is that unusual employer who discriminates against the majority." *See Zambetti*, 314 F.3d at 255 (6th Cir. 2002).

Even if Roschival could establish a prima facie case of racial discrimination, as will be discussed, Gavulic has offered a legitimate reason for terminating her, and Roschival has not rebutted that with evidence sufficient for a reasonable jury to find that the reason was a pretext for unlawful racial discrimination. So the Court will assume, without deciding, that Roschival has established a prima facie case and will proceed to the pretext stage. *See Frizzell v. Sw. Motor Freight*, 154 F.3d 641, 646 (6th Cir. 1998) (affirming summary judgment for plaintiff's failure to establish pretext in state-law gender discrimination claim, noting, "We, like the District Court, assume that plaintiff established a prima facie case"). However, for purposes of the pretext analysis, the Court will, of course, still consider Roschival's evidence for making out a prima facie case. *See Jackson*, 814 F.3d at 779 ("[O]n summary judgment, [i]n evaluating pretext and the plaintiff's ultimate burden, the court should consider all [probative] evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage." (internal quotation marks and citations omitted, second alteration in original)).

**B.**

It is undisputed that Gavulic has offered a non-discriminatory explanation for terminating Roschival. As she stated in her affidavit, during Hurley's reorganization, the hospital "shifted a larger majority of the workers' compensation responsibilities" to a third-party administrator. (Gavulic Aff. ¶ 6.) Accordingly, said Gavulic, "With the [third-party administrator] handling most of the workers' compensation functions, there was no need for a full-time employee to do workers' compensation and, therefore, [Hurley] eliminated the classification 'Human Resources Coordinator I.' . . . Because Nancy Roschival was the only employee in the 'Human Resources Coordinator I' classification, she was laid off effective August 14, 2014." (*Id.* ¶¶ 7–8.)

**C.**

The question now becomes whether Gavulic's reason was a pretext for racial discrimination. In general, "[a] plaintiff may show pretext by demonstrating: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the adverse employment action, or (3) that they were insufficient to motivate the adverse employment action.'" *Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 2013) (alterations in original) (quoting *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir.2004)); *see also Alexander v. Ohio State Univ. Coll. of Soc. Work*, 429 F. App'x 481, 487 (6th Cir. 2011) (applying the same test to a Section 1983 discrimination claim). A "plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009). Roschival does not specify which theory of pretext she pursues.

12

**1.**

Roschival's main argument is that Hurley's failure to follow its layoff procedures—the basis of her state-law wrongful termination claim—establishes pretext. Roschival cites *Pippin v. Burlington Res. Oil And Gas Co.*, 440 F.3d 1186, 1193 (10th Cir. 2006), where the Tenth Circuit noted that a plaintiff can show pretext in a reduction in force case with evidence that "[her] own termination does not accord with the RIF criteria." *See also Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 422 (6th Cir. 1999) ("Having concluded that FERMCO's reason for laying off Skalka was not worthy of belief and having heard evidence that FERMCO 'lost' the peer group's ranking forms, deviated from its normal procedures, and fired the oldest and most qualified RSO, the jury was entitled to find that discrimination had occurred."). But Roschival's "ultimate burden" is to "persuade[] the court that she was the victim of intentional discrimination." *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). And "[s]tanding alone, deviation from a company policy does not demonstrate discriminatory animus." *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355—56 (11th Cir. 1999) (per curiam) ("Even assuming that USBI did deviate from its [layoff] policy, this deviation does not raise an inference of discrimination." (citing cases)); *see also Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1168 (10th Cir. 1998) (observing that "minor inconsistencies in the application of RIF criteria may be too insubstantial to allow a reasonable jury to infer that the RIF was pretextual").

To support her claim that Gavulic misapplied the layoff procedures, Roschival cites affidavits and testimony from Rebecca Jackson and Lisa Foster—two experienced human resources professionals who left Hurley several years before Roschival's termination. They each opined that Hurley "did not follow polices found in the Hurley Medical Center Exempt Employee Handbook on pages 7 and 8" when it terminated Roschival. (Jackson Aff. ¶ 15; Foster

Aff. ¶ 15.) According to Jackson and Foster, the layoff procedure provided, "If there were a job series within a particular promotional unit for a particular classification, then the lowest number within the job series with the least senior employees would be laid off first." (Jackson Aff. ¶ 9; Foster Aff. ¶ 9.) Accordingly, they each concluded that "Dozier should have been laid off because "he was in the lower Human Resource Coordinator position within the job series and he had the least amount of seniority." (Jackson Aff. ¶ 17; Foster Aff. ¶ 17.)

At first glance, this explanation appears to have little support in Hurley's procedures. Granted, a general "Employment Policy" dating to the 1970s, which Roschival cites, provided that layoffs were to be determined by series: "Layoff of employees shall be made in the inverse order of their employment" and "[w]hen layoffs are to be made which might involve the employees of two or more classes of a series, those employees of the lowest class shall be laid off first on the basis of their seniority." (Pl.'s Ex. 8, Older Policy at 15.) But Roschival describes this general policy as an "older" policy, (Pl.'s Resp. at 6), and she does not contend that it was still in effect at the time she was terminated.

In contrast to the older policy, the employee handbook in effect at the time of Roschival's termination makes no express mention of series. It instead hinges layoffs on classification, and it provides, "Employees who are laid off may not bump other employees in other classifications and/or departments."[7] (Handbook at 8.) As Roschival describes in her brief, Gavulic, "had no idea how a layoff was conducted" and "directed Roriex to determine who was to be laid off."

---

[7] As noted in *supra* n. 3, the handbook also provides that full-time employees bump other types of workers, such as temporary and part-time employees. (Handbook, at 7.) Mansour acknowledged that in September 2013, the human resources department had some temporary employees and contract workers. (Mansour Dep. at 24.) Roschival summarily claims in her brief that "they should have been laid off before" her. (Pl.'s Resp. at 14.) This does not appear to relate to her racial discrimination claim, and she cites no evidence of the temporary employees' and contract workers' race. Even if she had, she cites no evidence that these individuals were still employed at the time of her actual termination, in July 2014.

(Pl.'s Resp. at 9, 11.) Consistent with the handbook, because Roriex concluded that Roschival was the only employee in her classification (Roriex Dep. at 27–28; Gavulic Dep. at 53), she told Gavulic that Roschival should be terminated, not Dozier, (Roriex Dep. at 38–39; Gavulic Dep. at 10). And Gavulic deferred to Roriex's conclusion. (Gavulic Dep. at 10.)

This is not to say that Gavulic played an entirely passive role in the decision. Roriex testified that during the process, Gavulic asked to confirm that Roschival, not Dozier, should be laid off. (Roriex Dep. at 45.) Roriex's testimony also included the following exchange:

> Q.   All right. So there was some discussion between you and Melany [Gavulic], whether it be email or otherwise, as to who was to be laid off; Jamal [Dozier] or Nancy?
>
> A.   She asked me how to handle the layoff for Nancy. Because EHO, they were getting rid of EHO, and we didn't have a place to put Nancy. So it resulted in a layoff.
>
> Q.   So how did Jamal's name come up?
>
> A.   I believe she just wanted to know that it wasn't Jamal because of their titles. The titles were different. So I told her, no, it wasn't Jamal.
>
> Q.   So she expressed to you that she did not want to see Jamal lose his job?
>
> A.   Yeah, she did say don't want—she didn't want anybody to lose their job.
>
> Q.   She expressed to you that she didn't want to see Jamal lose his job?
>
> A.   I believe she did say that.

(Roriex Dep. at 48.)

Roschival concludes that this means that "Roriex specifically testified that Defendant Gavulic did not want Dozier to be laid off. In other words, both Roriex and Defendant Gavulic singled out Plaintiff for this layoff." (Pl.'s Resp. at 22.) Even construing the evidence in the light most favorable to Plaintiff, this is not a fair reading of Roriex's testimony. Roschival ignores that Roriex testified that Gavulic "didn't want *anybody* to lose their job." (Roriex Dep. at 48

15

(emphasis added).) True, Roriex was asked, and answered, a specific follow-up question about Dozier, stating that Gavulic did not want Dozier to lose his job. *Id.* But that answer does not negate, and indeed is entirely consistent with, Roriex's immediately prior testimony that Gavulic did not want *anyone* to lose their job—testimony that also necessarily implies that Gavulic did not want Roschival to lose her job either. Thus, this testimony does not support a reasonable inference that Gavulic specifically targeted Roschival for termination.

And it was not unreasonable for Gavulic to defer to Roriex's conclusion that Roschival and Dozier were in different classifications, as evidence supports that conclusion. In particular, job descriptions confirm that their two positions—Human Resources Coordinator and Human Resources Coordinator I—were different not only in name. (*See* Pl.'s Resp. Ex. 12–13.) As Roschival confirmed in her testimony, she still retained her worker's compensation role once her title became Human Resources Coordinator I. (Roschival Dep. at 17.) Yet Dozier had no involvement with worker's compensation, and Roschival did not do any of what he did. (Roschival Dep. at 17.) Moreover, Dozier has no apparent connection to the Employee Health Office, the elimination of which was the source of the layoff at issue.

Nonetheless, Defendants' counsel conceded at oral argument that the meaning of classification is ambiguous because the handbook does not define the term. He also acknowledged that—consistent with Foster's and Jackson's statements—Hurley still conducts layoffs by taking series into consideration. Even so, Defendants' counsel urged that Roschival should not have bumped Dozier because they are not in the same series, as their job descriptions differ. But this conclusion is inconsistent with Jackson's testimony that positions fall into a series when the "minimum entrance requirements" found in the job descriptions build on each other— in other words, a more senior position in a series includes the skills of the junior position, and

then some. (*See* Jackson Dep. at 43.) Indeed, while Roschival's and Dozier's job descriptions were different, Roschival's position did include Dozier's position's minimum entrance requirements, and then some, which could suggest their positions fell within the same series. (*See* Pls. Ex. 12–13.) To add to the uncertainty, in contrast to Defendants' counsel's assertion about layoffs still occurring by series, his own witness, Roriex, testified, "I don't recall a layoff happening by series." (Roriex Dep. at 42.)

This all suggests that some confusion surrounded how Hurley's layoff procedures should have applied to Roschival. To be sure, both sides present reasonable interpretations of those procedures. But an issue of fact concerning Roriex's application of the layoff procedures does not necessarily create a genuine issue of material fact as to whether Gavulic—the sole defendant for this claim—discriminated against Roschival for being white when she decided to defer to Roriex's application of those procedures.

**2.**

This leads to the problem with Roschival's claim: even if Gavulic did not want Dozier specifically to lose his job, and even if she deferred to an incorrect application of the layoff procedures to obtain that result, nothing ties this to Roschival's race.

Roschival hints that racial animus was at play by pointing out that Roriex, like Dozier, is black. (Pl.'s Resp. at 2, 12.) But in her testimony, Roschival denied that Gavulic or anyone else involved in the decision-making process had discriminatory animus toward her:

> Q.     . . . Is there anything that Melany [Gavulic] has done or said that suggests to you that she discriminates against white people?
>
> A.     No.
>
> Q.     Is there anything that anybody else has told you, other than your lawyer, anything that anybody else has ever said to you that suggests to you that Melany discriminates against white people?

17

A.      No.

Q.      Is there anybody who was in the HR department at the time we're talking about, August, July of 2014, that you think discriminates against white people and could have been involved in the decision to not let you bump?

A.      No, not that I'm aware of.

(Roschival Dep. at 23.)

Roschival's only other evidence concerning racial discrimination has nothing to do with Gavulic. In particular, Roschival claims that a "discriminatory atmosphere surrounding layoff decisions" at Hurley demonstrates that she was "singled out for layoff for an impermissible reason." (Pl.'s Resp. at 22.)

As the Sixth Circuit has held, "Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff," because "such evidence does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." *Risch*, 581 F.3d at 392 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998)). Several factors guide the Court in determining whether evidence of a discriminatory atmosphere is probative of discrimination: "the [actor]'s position in the [employer's] hierarchy, the purpose and content of the [conduct], and the temporal connection between the [conduct] and the challenged employment action, as well as whether the [conduct] buttresses other evidence of pretext." *Rachells*, 732 F.3d at 665 (alterations in original).

Roschival asserts that the evidence here "is very similar to the evidence presented by the plaintiff" in *Rachells*. (Pl.'s Resp. at 23.) That is a stretch. In *Rachells*, the plaintiff's evidence of a discriminatory atmosphere was specific and temporally proximate to his termination. In

18

particular, affidavits from two former employees showed that leading up to the plaintiff's termination, (1) a senior manager promoted a white person to a management position "over more qualified minority candidates"; (2) the newly promoted white manager "gave undeservedly poor evaluations to minority employees, as well as preferential treatment in promotions and disciplinary actions to white employees"; and (3) the senior manager was "nonresponsive to minority employees' complaints about discriminatory performance reviews." *Rachells*, 732 F.3d at 669. The Court held that this evidence, along with the plaintiff's "superior qualifications"— including numerous accolades suggesting that he was given "an undeservedly poor review to create pretext for his discharge"—were sufficient for him to raise genuine issues of material fact on both the issue of pretext and the "additional evidence" required for a prima facie case in the reduction in force context. *Id.* at 668–69.

In stark contrast to the evidence in *Rachells*, Roschival offers what amounts to little more than a conclusory, unsupported assertion that a discriminatory atmosphere existed at Hurley at some unspecified time, but clearly before Gavulic became CEO. As Jackson wrote in her affidavit:

> [T]here was a past practice within the Human Resource Department, and also within the hospital as a whole, that when reorganization/layoffs did occur, special preference was given to African-American employees in their retention. In other words, Hurley Medical Center made great strides to retain African-American employees during reorganizations and layoffs. Caucasian employees were not given the same consideration as African-American employees with respect to reorganizations/layoffs within the hospital.

(Jackson Aff. ¶ 20.)[8] Jackson also testified that at unspecified times in the past, after proposing someone to layoff, "The union would sometimes say, 'That person is African American. We

---

[8] The Court notes that Foster's affidavit, the substance of which was otherwise mostly verbatim with Jackson's affidavit, did not contain this amorphous paragraph. At oral argument, counsel for Roschival stated that Foster's human resources role was different from Jackson's

don't want that person laid off.'" (Jackson Dep. at 71–73.) The Court finds that this does not help Roschival meet her burden to show that Gavulic's reasons for terminating her were a pretext for racial discrimination. None of the factors discussed in *Rachells* and other cases suggest this evidence is probative of the alleged discrimination in this case.

To start, Jackson's testimony identifies no actors who carried out this alleged practice—other than her generalized mention of the "union"—let alone such actors' "position in the hierarchy." *See Rachells*, 732 F.3d at 665. Because Roschival and Dozier were both non-bargaining unit employees, the union's past practice appears to have little relevance here. More important, nothing ties the union's past practice to Gavulic—the sole Defendant for Roschival's Section 1983 claim—who became CEO of Hurley only during the last two years of Roschival's employment.

Jackson's testimony also sheds little light on the "purpose and content" of the alleged favoritism of black employees during layoffs, as the details are sparse. *Rachells*, 732 F.3d at 665. The Court notes, however, while Roschival does not discuss this, Hurley did at one time have an express affirmative action policy, which was contained in the older employment policy—dating to the 1970s—that Roschival attached to her response: "It shall be the responsibility of Hurley Medical Center to take affirmative action, as required by law, to assure that all levels of job categories are reasonably representative of the minority and sex composition of the Medical Center's service area." (Pl.'s Resp. Ex. 8, Older Policy at 3.) As a panel of the Sixth Circuit once observed, while "we have found no circuit precedent on point, our sister circuits recognize the existence of an affirmative action plan to be irrelevant to proving discrimination unless the employer acted discriminatorily pursuant to the plan." *Hagan v. Warner/Elektra/Atl. Corp.*, 92 F.

---

human resources role, so Foster was not exposed to the practice of favoring African Americans during layoffs. There is nothing in the record that suggests Gavulic was so exposed.

App'x 264, 266–67 (6th Cir. 2004) (citing cases). Here, nothing suggests that this express policy, or the union's practice described by Jackson, in any way influenced Gavulic's decision to terminate Roschival. Indeed, when Jackson was asked whether she had any knowledge as to whether race was a factor in the decision to terminate Roschival, she testified, "I have no—I have no understanding that that would have been the situation. I know what has happened in the past." (Jackson Dep. at 70.) And the express affirmative action policy from the older employment policy does not appear in the current employee handbook that everyone agrees applied to Roschival's termination.

Nor does Jackson's testimony establish a temporal connection between the alleged minority favoritism and Roschival's termination. *See Rachells*, 732 F.3d at 665. Jackson left Hurley in 2010, several years before Roschival's 2014 termination and before Gavulic assumed her role as CEO. (Jackson Aff. ¶ 2.) Nothing even suggests that a practice favoring minorities during reorganizations even existed when Jackson left in 2010. She expressly described it as a "past practice" and mentioned no specific timeframe. (*Id.* ¶ 20.) True, "evidence of a . . . discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment." *Rachells*, 732 F.3d at 665. But Jackson's statement provides no timeframe, context, or specific examples like the voluminous evidence of a discriminatory atmosphere discussed in *Rachells*—or other cases for that matter. *See*, *e.g.*, *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 392–94 (6th Cir. 2009) (holding that evidence showed a discriminatory atmosphere because "male officers frequently made degrading comments regarding the capabilities of female officers, expressed the view that female officers would never be promoted to command positions, and made generally degrading remarks about women" and

21

that a male officer "who occupied a senior position in the command staff, discriminated against female officers in distributing work").

Thus, Jackson's testimony is nothing more than a conclusory assertion that a discriminatory atmosphere may have existed at Hurley at an unknown time in the past. The Court doubts the propriety of forcing Gavulic to inherit responsibility for a practice at Hurley by allowing the inference that she too acted with racial animus simply because the union may have at some time in the past. Without more support or details, the Court finds that, even when combined with Roschival's other evidence, this evidence is not probative as to whether a discriminatory atmosphere existed at Hurley at the time of Roschival's termination. It thus creates no genuine issue of material fact surrounding pretext.

* * *

In sum, on one hand, Defendants have undisputed evidence that they closed the Employee Health Office for legitimate reasons. In the process, they terminated Roschival instead of a black employee—one who had no connection to that office or Roschival's duties—in a way they interpreted as consistent with Hurley's current layoff procedures. Roschival acknowledges that no one involved in that decision had any discriminatory animus toward her. On the other hand, two former employees say that the layoff procedures should have been applied differently. But nothing suggests that any deviation from the policies had anything to do with race—other than vague testimony that at an unspecified time in the past, Hurley tended to favor black employees when conducting layoffs. The Court finds that this is not enough for a reasonable jury to conclude that Gavulic's reasons for terminating Roschival were a pretext for racial discrimination.  Accordingly, the Court will grant summary judgment and dismiss Roschival's Section 1983 claim.

22

## IV.

As the Court will grant summary judgment as to Roschival's sole federal claim, this raises the question of whether the Court should retain supplemental jurisdiction over the remaining state law claims.

"Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims. Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) (internal quotation marks and citations omitted). Here, the Court finds that the interests of judicial economy and the avoidance of multiplicity litigation do not outweigh the concern of needlessly deciding state law issues.

Roschival's primary claim is wrongful termination under Michigan law. Defendants concede that Roschival was a "just cause" employee for purposes of this claim because the handbook "could have instilled legitimate expectations that she would not be terminated except for just cause." (Defs.' Resp. at 1–2.) But Roschival relies on a narrow theory for her claim. Specifically, in *Boynton v. TRW, Inc.*, 858 F.2d 1178, 1184 (6th Cir. 1988) (en banc), the Sixth Circuit held that under Michigan law, a terminated "just cause" employee could not bring a wrongful discharge claim based on the "justness" of an employer's termination decision that was "born of economic necessity." Nevertheless, the Court observed that the plaintiff could still challenge the procedure his employer used in determining to discharge him instead of less senior co-workers. *Id.* Roschival also cites *Damrow v. Thumb Co-op. Terminal, Inc.*, 337 N.W.2d 338, 342–43 (Mich. Ct. App. 1983), where, outside of the reduction in force context, the Michigan Court of Appeals held that when an employer's manual establishes its obligations to its

23

employees, the employer must "comply with the rules set forth in the employee manual in discharging its employees."

Yet *Boynton* and *Damrow* were decided years before the Michigan Supreme Court held in *McCart v. J. Walter Thompson USA, Inc.*, 469 N.W.2d 284, 287 (Mich. 1991), that "bona fide economic reasons for discharge constitute 'just cause.'" At oral argument, Roschival's counsel urged that *McCart* concerned only the "justness" of the layoff—in other words, whether layoffs should have happened at all. If true, that would mean *McCart* left intact *Boyton's* cause action for challenging layoff procedures. But the *McCart* court made clear that the plaintiff conceded that at the time of his termination, his employer was "reducing its work-force for economic reasons." *Id.* at 286. So it seems that more than the "justness" may have been at issue. The plaintiff challenged that his discharge was wrongful for numerous reasons, including that it had "nothing to do with the reduction in work-force," that "defendant attempted to disguise the true nature of plaintiff's discharge by doing it in the course of a work layoff," and that "'numerous factual disputes' existed such as . . . the method utilized by defendant to accomplish the discharge." *Id.* at 286. The court held that summary disposition was appropriate because the plaintiff "failed to raise any genuine issue of fact regarding the validity of defendant's proofs that adverse business conditions existed and that the elimination of plaintiff's position was necessitated by those conditions." *Id.* at 287.

*McCart* thus clouds whether *Boynton*'s alternate path to relief—challenging the application of layoff procedures in a reduction in force case—is something a Michigan court would deem available under the Michigan law of wrongful termination. And Roschival has pointed to no post-*McCart* authority applying *Boynton* and *Darrow* in the way she urges.

2:15-cv-10182-LJM-EAS   Doc # 26   Filed 05/26/16   Pg 25 of 25   Pg ID 409

A Michigan court is better equipped to resolve this issue. And such a court would be as equipped as this one to resolve Roschival's ELCRA claim. Thus, the Court declines to exercise supplemental jurisdiction over these two claims.

**V.**

For the reasons discussed, Defendants' Motion for Summary Judgment (Dkt. 22) is GRANTED IN PART. Summary judgment is GRANTED as to Count I of the amended complaint because Roschival has raised no genuine issue of material fact. The remaining counts are DISMISSED because the Court declines to exercise supplemental jurisdiction over those claims.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated: May 26, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 26, 2016.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson